HOLDERMAN, APPELLANT, *v.*
HUNTINGTON LEASING COMPANY,
APPELLEE.

(No. 83AP-1125—Decided July 10, 1984.)

*Carlile, Patchen, Murphy & Allison, Donald A. Antrim* and *Donald B. Leach, Jr.,* for appellant.

Porter, Wright, Morris & Arthur, Fred Pressley, Jr., and Michael J. Underwood, for appellee.

McCORMAC, P.J. Mark Holderman, plaintiff-appellant, filed a complaint in the Franklin County Municipal Court against the Huntington Leasing Company ("Huntington"), defendant-appellee, alleging that Huntington hired him to solicit and obtain leasing business at an annual salary at $22,000 plus bonus. Holderman alleged that the written bonus in effect provided for a maximum bonus of sixty percent of his salary amounting to $13,200, which he earned, but that Huntington breached its contract by failing to pay him $9,761 of the bonus due, for which he sought judgment.

Huntington answered admitting that it hired Holderman as a commercial lease sales representative with a salary of $22,000 per year. Huntington denied that it had failed to pay Holderman in accordance with the bonus program and alleged that he had been fully paid in accordance therewith. Further, Huntington counterclaimed for $275 paid to Holderman by error, for which judgment was sought.

Huntington subsequently moved for summary judgment supported by depositions, affidavits, and exhibits. Holderman resisted the motion for summary judgment by submitting his affidavit and a counter-motion for summary judgment.

The trial court sustained Huntington's motion for summary judgment on the complaint and the counterclaim, and denied Holderman's motion for summary judgment.

Holderman has appealed, asserting the following assignments of error:

"1. The Municipal Court of Franklin County, Ohio erred in rendering summary judgment when material fact and legal issues were in dispute.

"2. The Municipal Court of Franklin County, Ohio erred in determining that the decision of the defendant was beyond judicial scrutiny when issues of material fact were in dispute."

The evidence shows that Holderman was employed as a leasing officer for Huntington in May 1981, at a salary of $22,000 a year plus bonus. While the terms of the bonus program were not specifically discussed prior to employment, Holderman was presented with a copy of the incentive or bonus program prior to earning the bonus, which program was part of the consideration for his employment.

The dispute giving rise to Holderman's legal action involves the interpretation of the written incentive agreement in effect at the time of his employment. Holderman made sales during the course of his employment with Huntington in the last quarter of 1981 that resulted, he contends, in a bonus exceeding the amount Huntington paid to him — unless there was a limitation in the bonus agreement, as Huntington contends, of sixty percent of his base salary for each quarter that would not carry over to later quarters. Specifically, Huntington contends that the written incentive program provided for a maximum payment of sixty percent of an employee's base salary per quarter, and Huntington paid Holderman accordingly (except that he was paid slightly more than sixty percent). On the other hand, Holderman contends that the bonus program provides only for a maximum bonus of sixty percent of his base salary per year with no quarterly limitation. He asserts that, if he earned the maximum bonus in one quarter, he was entitled to be paid that amount.

Huntington also argues that interpretation of the bonus agreement was within its sole discretion, absent fraud, and that its interpretation was binding on the courts and Holderman since no fraud was shown. The trial court agreed with that argument and held that Holderman was limited to the bonus de-

termined to be applicable by Huntington.

Holderman was promised an incentive program to earn a bonus as part of the consideration of his employment, and he was given a written copy of the agreement prior to the time that he earned his bonus. Hence, the written contract providing for bonus incentives was part of the contract of employment between the parties. Turning to that agreement, it provided that "[t]he bonus will be a percentage of actual base pay and will be paid quarterly." For maximum bonus, there was a provision as follows:

"Maximum bonus under this program will be limited to 60% of the average base salary for the year."

There was also a provision, as follows, regarding the plan:

"This plan may be changed, supplemented or deleted in its entirety from time to time, without prior notice. The interpretation of all policies under this plan and final disposition of any controversies regarding this plan shall be decided exclusively by HLC [Huntington] in its sole discretion."

Attached to the plan is an example which shows the calculation of incentive pay on a quarterly basis but which does not give any insight into the determination of whether there is any carry-over that would apply in the event that a quarterly bonus is earned which is in excess of sixty percent of the quarterly salary. The example shows the earning of a quarterly bonus that was less than sixty percent of the employee's quarterly base salary.

At the very least, the incentive program in effect at the time Holderman earned his bonus was ambiguous as to whether there was a maximum quarterly limitation in addition to the annual limitation. The contract provided specifically for only one maximum limitation which was sixty percent of the base salary for the year. That limitation

in Holderman's case would have been sixty percent of $22,000, amounting to a maximum bonus of $13,200. The contract provided for quarterly payments, but there was no specific statement in the plan that the person earning the bonus was limited to sixty percent of his quarterly base salary which, in Holderman's instance, would have been sixty percent of $5,500 or $3,300. The example attached to the plan impliedly supports a limitation for payment at the end of the quarter of sixty percent, in that a calculation is made which is stated to be 20.30 percent of the base quarterly salary. However, the example does not address the question of what happens if more than sixty percent of the quarterly base is earned in any particular quarter. Interpreting the example consistently with the annual limitation, any excess would be deferred to later quarters. If there was intended to be a quarterly limitation of sixty percent with no carryover, it would be redundant to state an annual maximum of sixty percent because the annual limitation would automatically follow.

The general rule of statutory interpretation for contracts is that ambiguities must be construed against the drafter of the agreement. *Monnett* v. *Monnett* (1888), 46 Ohio St. 30, 34-35. Construing the plan in that manner, the only limitation applicable to Holderman would be sixty percent of his annual base salary with no quarterly limitation. Prior to earning whatever bonus he earned, Holderman was not informed of specific terms for payment of bonus other than the written plan provided him. There was also evidence that one employee had been paid a quarterly bonus of more than sixty percent of his base salary (seventy-three percent) and that Holderman received payment slightly in excess of sixty percent himself.

Huntington argues that the provision in the incentive plan, that "[t]he in-

terpretation of all policies under this plan and final disposition of any controversies regarding this plan shall be decided exclusively by HLC [Huntington] in its sole discretion," requires a court to find that Huntington's interpretation controls absent a showing of bad faith or fraud. Huntington relies primarily on the case of *Oiler* v. *Dayton Reliable Tool & Mfg. Co.* (1974), 42 Ohio App. 2d 26 [71 O.O.2d 130], for this proposition.

In *Oiler,* an administrative committee was delegated authority in the agreement in question to make certain decisions which were stated to be final when made in good faith. The decision at issue that the administrative committee made was in full accordance with the wording of the profit-sharing plan voluntarily set up for the benefit of the employees, who did not contribute thereto. In other words, the administrative committee did not change the agreement but, according to the *Oiler* court, correctly read and interpreted the agreement and thus acted within the scope of its authority. While there is rather broad language in *Oiler,* at 34, indicating that the employer's decisions in conjunction with such powers shall be binding unless made capriciously, fraudulently, or in bad faith, those statements were unnecessary to the *Oiler* decision since the administrative committee decided the matter in accordance with the agreement, as also interpreted by the court.

The provision in the plan in the present case, providing that the interpretation of all policies under this plan and final disposition of any controversy regarding the plan shall be decided exclusively by Huntington in its sole discretion, does not apply where the interpretation is contrary to that which would be applied by an objective and impartial body applying applicable contract construction principles. Such decision goes beyond the interpretation of the

policies under the plan and involves an amendment of the plan after a bonus has been earned. In other words, Huntington is bound by its agreement where no discretion is provided within the promises of the agreement. Where the agreement does provide for a discretionary bonus, as in part of the bonus in the plan herein, the principles stated in *Oiler* do apply to Huntington's determination.

As stated in *Hainline* v. *General Motors Corp.* (C.A.6, 1971), 444 F.2d 1250, at 1256, courts do not generally look favorably upon provisions that give one party to a contract the power to unilaterally settle all disputes arising under the agreement. In *Hainline,* the Court of Appeals for the Sixth Circuit first interpreted the agreement, which provided the *initial* basis from which the employer or its committee was given discretion to act, and then found the reasonable construction to be given to the agreement.

In this case, the trial court did not interpret the agreement in regard to whether the maximum bonus was limited to sixty percent of the annual base salary, or whether there was a quarterly limitation of sixty percent of the quarterly salary with no carry-over in regard to the maximum bonus. Instead, the trial court gave *carte blanche* authority to the employer to interpret the plan in the way that it saw fit, absent fraud, or bad faith. The trial court did not address the interpretation to be given the disputed terms of the agreement in light of recognized construction principles which is the starting point to the determination of whether the construction given the provisions of the plan was reasonable or whether it constituted an amendment or change of the plan after Holderman's rights had vested.

Huntington did not establish a right to summary judgment, as there was a genuine issue of fact and law about whether Huntington had complied with

the incentive plan that was part of Holderman's contract of employment.

Holderman agrees that the trial court properly granted partial summary judgment for Huntington on its counterclaim for $275. That amount was paid in error for expenses that were not incurred by Holderman and were not reimburseable to him. Hence, partial summary judgment for Huntington on its counterclaim in the amount of $275 was proper.

Holderman's assignments of error are sustained, to the extent indicated in this opinion. The summary judgment of the trial court for Huntington on the complaint is reversed, and the cause is remanded to the trial court for further procedure consistent with this opinion. The partial summary judgment for Huntington on its counterclaim is affirmed.

*Judgment reversed in part, affirmed in part, and case remanded.*

WHITESIDE and NORRIS, JJ., concur.